IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL NO. 09-272 |
| v. | : |
| | : |
| NATHANIEL WILKERSON | : |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                             **February 1, 2010**

Defendant Nathaniel Wilkinson[1] seeks to suppress evidence found when two police officers entered a residence pursuant to Wilkinson's consent and searched a bag he was attempting to conceal to ascertain if the bag contained a weapon. Wilkinson further seeks the suppression of statements he made after he was placed under arrest. Wilkinson's Motion to Suppress the narcotics evidence is denied because the contents of the bag were revealed during a valid search, but this Court will suppress Wilkinson's un-*Mirandized* statements insofar as the Government attempts to introduce those statements during its case-in-chief at trial.

**FINDINGS OF FACT**

1. On December 1, 2008, at approximately 9:54 p.m., patrolling Philadelphia Police Officers Thomas Kolenkiewicz and Melissa Curcio received a radio dispatch stating there had been an armed robbery by two black males at 1536 South 8th Street.

---

[1] Although this case remains captioned with the alias "Wilkerson," it appears Defendant's last name is "Wilkinson."

1

2. The dispatch included a partial description of the clothing worn by the robbers, describing the suspects as two black males wearing black jackets and black hats. One suspect was further described as short.

3. Officers Kolenkiewicz and Curcio drove to 1536 South 8th Street and attempted to interview the two robbery victims, who did not speak much English. The victims entered the patrol car and sat in the backseat. One victim informed the officers the suspect was a black male who had gone in the direction of Dudley Street.

4. With the victims in the patrol car, Officer Curcio drove about three blocks down 8th Street. She turned left onto Dudley Street. She and Officer Kolenkiewicz observed two black males walking on the sidewalk on Dudley Street, toward the patrol car. The males were approximately half a block away.

5. Upon observing the patrol car, the two men quickly entered a residence the officers believed to be located at 723 Dudley Street. Officers Curcio and Kolenkiewicz saw the screen door of the residence at 723 Dudley Street shut.

6. Officer Curcio parked the patrol car in the middle of the street. As she exited the vehicle, she observed the inner door of 723 Dudley Street was ajar. She could see into the house, and she observed Wilkinson inside.

7. Officer Curcio asked the Defendant if the officers could come inside to speak with him. Wilkinson, who was wearing a dark green hoodie, agreed and opened the door. Both officers entered the residence.

8. Wilkinson asserted the home belonged to his mother and, in response to the officers' questioning, said no other black male was present in the residence.

9. The officers observed Wilkinson making nervous, jittery motions after the officers entered the residence.

10. Officer Curcio walked to the separate kitchen area of the home to ascertain whether another male was present.

11. Meanwhile, Officer Kolenkiewicz remained with Wilkinson in the living room, which opened up to the adjacent dining room area. No door separated the dining room from the living room. Officer Kolenkiewicz observed Wilkinson move to the dining area and pick up a black-and-white bag labeled "Game Stop" from a table. Wilkinson clutched the bag against his torso.

12. Upon observing Wilkinson pick up the bag, Officer Curcio instructed Officer Kolenkiewicz to take the bag because she was concerned it contained a weapon.

13. Officer Kolenkiewicz approached Wilkinson. Wilkinson attempted to conceal the bag by turning his back to the officer with the bag held in front. Officer Kolenkiewicz attempted to reach for the bag, but Wilkinson turned away, moving from side-to-side, to prevent the officer from touching the bag.

14. Wilkinson's mother came down the staircase leading to the second floor. Wilkinson attempted to hand the "Game Stop" bag to his mother, but Officer Kolenkiewicz intercepted the bag by grabbing its bottom while Wilkinson held it, arm extended. As he squeezed the bag, Officer Kolenkiewicz felt a hard object and observed the bag contained a substance of substantial weight.

15. Officer Kolenkiewicz took the bag from Wilkinson and opened it. Officer Kolenkiewicz, who had worked in the narcotics division of the police department for several years, recognized the smell from the bag as an odor consistent with "crack" cocaine. He looked in

the bag and observed several Ziploc bags containing white, rock-like substances that he believed were "crack" cocaine. He also observed other Ziploc bags with a powdery substance Officer Kolenkiewicz believed to be cocaine.

16. The contents of the bag weighed approximately 300 grams (a little more than 10.58 ounces).

17. Officer Kolenkiewicz set the bag aside and handcuffed the Defendant. He did not mention the drugs, tell Wilkinson he was under arrest, or inform Wilkinson of his *Miranda* rights.

18. After Wilkinson was handcuffed, Officer Kolenkiewicz told him he was "lucky" his mother had not touched the "Game Stop" bag. Wilkinson responded that his mother did not have anything to do with the drugs.

19. Officer Kolenkiewicz searched Wilkinson while he was handcuffed and found $455 in his right front cargo pants pocket.

20. Officer Curcio asked the victims in the car if Wilkinson was the man who committed the armed robbery. They informed her he was not.

21. As she led Wilkinson to the police car, Officer Curcio told him, "You seem like a really nice guy. It's a shame you got caught up in something like this." Wilkinson responded he dealt drugs to pay for his daughter's education. At this point, he had not received any *Miranda* warnings.

22. After Wilkinson was taken to jail, Officer Curcio performed another search and discovered an additional $225 from Wilkinson's left cargo pants pocket.

**DISCUSSION**

First, this Court must consider whether the search of the bag was constitutionally permissible. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Warrantless searches "are *per se*

unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) (citations and internal quotation marks omitted). However, a warrantless search or seizure does not violate the Fourth Amendment if conducted pursuant to valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). For consent to validate a search, courts must consider the totality of the circumstances to determine whether the consent was given voluntarily and was not "the product of duress or coercion, express or implied." *Id.* at 227-28. In making this assessment, courts examine "the characteristics of the accused and the details of the interrogation." *Id.* at 226. Relevant characteristics of an interrogated individual include his age, education, intelligence, and knowledge of his constitutional rights. *Id.* Relevant characteristics of an interrogation include the length of detention, whether questioning was repeated or prolonged, and whether the individual was deprived of food or sleep or was otherwise subjected to physically taxing circumstances. *Id.*

The Court finds Wilkinson's consent to the entry of his home was valid. Officer Curcio asked Wilkinson for entry, and he immediately gave his consent. The entire interaction was brief, involving a single request for entry, and there was no physical or mental deprivation. Further, Wilkinson's characteristics do not indicate he was incapable of granting consent under these circumstances–he is 32 years old and has had at least three separate arrests, which presumably gave his some understanding of the criminal justice system and his constitutional rights.

Consent to enter a home, however, does not equate to permission to search the entire residence. Wilkinson argues that even if his consent was valid, the officers did not have authority to search the content of the bag. The Government responds the search of the bag was a valid *Terry* search. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). A search is reasonable under *Terry* if a police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational

inferences from those facts, reasonably warrant" the officers in believing the suspect is dangerous and may gain immediate control of weapons. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). *Terry* allows a brief search based on "reasonable suspicion," a lower standard than probable cause. "Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). While information justifying the search must be specific and objectively reasonable, courts must also allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). If police who lawfully suspect enter a dwelling reasonably suspect a suspect is armed, they may conduct a *Terry* pat-down search for weapons. *United States v. Flippin*, 924 F.2d 163 (9th Cir. 1991). In determining whether reasonable suspicion exists, courts may consider a suspect's "nervous, evasive behavior" or flight from police. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

 Here, the police here were investigating an armed robbery and believe Wilkinson may have been one of the perpetrators of the crime. Wilkinson contends this belief was unreasonable, citing Third Circuit law holding a description of two robbery suspects as teenage African-American wearing dark, hooded sweatshirts was too general to provide reasonable suspicion. *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006). This case is distinguishable from the one at hand, because in *Brown* the two apprehended suspects were more than a decade older than the given description and the tip was not provided by a direct witness to the crime. Furthermore, in contrast to the instant case, the officer in *Brown* observed no suspicious behavior by the defendants.

It was reasonable for the officers to believe Wilkinson was armed based on the totality of the circumstances. When their police car came into view of Wilkinson, he swiftly entered the residence, which could reasonably be construed as an attempt to evade capture. Moreover, because the police officers were inside the home pursuant to Wilkinson's consent, the Court may also consider Wilkinson's suspicious movements with regard to the bag. His attempt to prevent Officer Kolenkiewicz from seeing or touching the bag created a justifiable concern that the bag contained a dangerous weapon. Once Officer Kolenkiewicz felt the bag, he could discern a weighty object was inside. As the Government points out in its supplemental brief, at more than 10 ounces the bag could have contained a lightweight pistol. Gov. Supp. Br. at 3 n.1 (noting a Ruger Lightweight Combat Pistol weighs approximately 9.4 ounces). Clearly, the bag could have contained any number of lighter weapons, such as a knife. Therefore, Officer Kolenkiewicz had reasonable suspicion to open the bag to ascertain whether it did, in fact, contain a weapon.

This Court must next consider whether Wilkinson's statements to Officer Kolenkiewicz and Curcio should be suppressed because they were elicited by the officers before Wilkinson was informed of his *Miranda* rights. *Miranda* prohibits statements derived from police coercion from being offered as evidence. *Moran v. Burbine*, 475 U.S. at 421 (explaining a statement must be "the product of a free and deliberate choice rather than intimidation, coercion or deception"). While Courts consider relevant factors such as length and location of the interrogation, its continuity, the defendant's maturity, level of education, physical condition, and his mental health, the essential factor remains "whether there was police coercion." *United States v. Andrews*, 231 Fed. Appx. 174, 176 (3d Cir. 2007) (citing *United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir.1994)); *see also United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir.1975)). The Government must show by a preponderance of the evidence statements complied with *Miranda*. *Bradshaw*, 462 US 1039, 1044-46

(1983). For *Miranda* rights to attach, the statements made by a defendant must be part of a custodial interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). "Interrogation" in this context is not limited to police question; instead, its definition includes "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (emphasis in original). In determining whether an interrogation occurred, the "analysis focuses 'primarily upon the perceptions of the suspect, rather than the intent of the police.'" *United States v. Brownlee*, 454 F.3d 131, 147 (3d Cir. 2006) (quoting *Innis*, 446 U.S. at 301). However, courts may also consider the intent of the police officer whose actions led to an incriminating statement. *Id.*

The Government agrees Wilkinson was in "custody" for *Miranda* purposes as soon as Officer Kolenkiewicz handcuffed him. At that point, Officer Kolenkiewicz made a comment Wilkinson could reasonably have perceived as implicating his mother in the crime. Officer Kolenkiewicz should have known such a comment was likely to elicit an incriminating response, because it is natural Wilkinson would seek to protect his mother from criminal prosecution. Similarly, Officer Curcio's comment about Wilkinson's participation in narcotics dealing called for Wilkinson's response, and likely to elicit a response as Wilkinson sought to explain his actions.[2] Therefore, these statements may not be used as evidence during the Government's case-in-chief.

However, Wilkinson's admissions are sufficiently reliable to be used for impeachment purposes should Wilkinson choose to testify. Under *Harris v. New York*, incriminating statements made in violation of *Miranda* may be admissible to cross-examine a defendant if the statement is sufficiently trustworthy and voluntary. 401 U.S. 222, 226 (1971). Again, the test for voluntariness requires this

---

[2] Indeed, the Government concedes Officer Curcio's statement should not be admissible in its case-in-chief. Gov. Br. at 13 n.3.

Court to consider the totality of the circumstances. *United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993). Among the relevant circumstances are the lack of a prolonged interrogation, the brevity of Wilkinson's detention before he uttered the statements, and Wilkinson's age, experience, and familiarity with the criminal justice system. In light of these circumstances, Wilkinson's statements to Officers Kolenkiewicz and Curcio were voluntary and may be introduced for impeachment purposes.

**CONCLUSIONS OF LAW**

1. Officers Curcio and K entered the residence at 723 Dudley Street pursuant to Wilkinson's valid consent.

2. Officer K had reasonable suspicion to believe the bag Wilkinson attempted to conceal contained a dangerous weapon so as to justify his touching the bag.

3. Because Officer K felt a hard, heavy object in the bag, he was justified in taking the bag and peering inside.

4. Wilkinson's responses to statements made by the arresting police officers were voluntary but were given in violation of *Miranda*. Therefore, the statements may not be introduced in the Government's case-in-chief, but may be used for impeachment purposes during cross-examination.

BY THE COURT:

/s/Juan R. Sanchez, J.
Juan R. Sánchez, J.